We have five cases on the calendar this morning, two patent cases, a case from the Court of Federal Claims, two government employee cases, and the latter two are being submitted on the briefs and will not be argued. The first case is a PTO case, In Re. Benjamin Slotznick, 2011-13-42. Mr. Simmons. JOHN D. SIMMONS Good morning. May it please the Court, I am John D. Simmons on behalf of the Appellant Applicant, Benjamin Slotznick. And from the Appellant's perspective, Your Honors, the issues here in the appeal are that the USPTO is misunderstanding or misconstruing the primary reference Weller, US Patent Number 7107526 at A85A106, and that they are improperly modifying Weller by a second reference, which is the World Wide Web Consortium or the W3C Web Content Accessibility Guideline, which would basically change the principle of operation of the base reference. And finally, even if it was modified, the end result would not meet the claims. So let me first address briefly Mr. Slotznick's invention. Mr. Slotznick's invention is for basically changing a coded file to make it enhanced readability for a reader who has difficulty distinguishing left from right. So the term left-right asymmetrical design is used throughout the claims and throughout the specifications. That left-right asymmetrical design could be a bar on the left that's one width and a bar on the right that's a different width from the right at all, or it could be a lavender bar on the left and a red bar on the right for left-right or just lavender on the left. So the director, improperly so, chose to analyze the broadest version, which would just be a left-right asymmetrical design on one side of the page. So somebody with a cognitive learning disability would know I start from the left and go to the right. So this is related to an invention for sifting webpages to determine if there's links or tags inside the webpages at a proxy server. So there's a proxy server 200 and that proxy server is going to analyze the pages for tags. And if there are tags, then it's going to send down to the user's computer injectable content. That injectable content might be a print function, a save function, an information. It has the same left-right orientation now, doesn't it? We'll acknowledge that in figure 8, which is the primary figure on page 894 that the director relies upon, one version allows you to send that injectable content to the left. You could send it to the bottom, to the right, to the top, or next to the link. That's the user selectivity. You can put this injectable content where you want. Mr. Simmons, would you agree that if Weller didn't show this symmetrical design on a conditional basis, that is, not on a single webpage basis, that it would fully anticipate? Well, I don't agree. Isn't that the only shortcoming of Weller? Well, there's two shortcomings actually, but I think the conditional one is very important, Your Honor. If it were to be overridden so that always sent injectable content to the left side of the screen, that would override the principle or the thrust of the invention of Weller. And I can refer you back to page 899, column 1, lines 50 to 53. The purpose of selectively sending injectable content is because often downloadable information is or contains large files. Thus, when a user attempts to access and download the information, the downloadable information can consume a great deal of storage space on the user's computer. And then on column 2, it says what the invention provides. The invention provides systems, methods, and graphical user interfaces that allow distributed network users to download information without needlessly consuming storage space or slowing operation of the user's computer or PDA. It goes on to explain that that's why the proxy server filters to see if there's tags on the page or not. So, if you look at figure 3, which is at 89, the director proposes that we'll destroy steps S210, S215, and S220, where at S210, it analyzes received content for a tag. If a tag is found, insert injectable content. If no tag is found, just send a plain page. The director's modification here would destroy the thrust of the claimed invention of Weller because the director says, let's always insert injectable content. If there was a tag for every page, then there would be injectable content for every page, correct? And that modification would require modifying every page on every web page or every website in the entire world. That doesn't make sense. It's not consistent with the rest. So, now we're going to go out and tell every web page in the entire world, you have to put tags on your web page. We know that there's pages that don't have injectable content. There's plain static pages that are downloaded. So, this is going to send that plain page without the additional injectable content. And this is the claimed invention of Weller. If you refer to the claims, page A105, for example, it claims determining whether the received document contains a plurality of links to respectively retrievable items and then inserting injectable content represented by an icon, button, or a button that goes back up to the proxy server to reduce overhead on the user's computer. If you always insert injectable content, you could be sending down a corporate logo, as the director said in its brief, that, you know, so now you're adding overhead to pages. And the whole purpose of Weller, as we said at page 899, was to reduce the memory going down to a user's computer. So, you know, it's well settled case law and that's our second point that if the claims were to change the principle of operation of the prior invention being modified, the teachings of the references aren't sufficient to render the claims prima facie obvious. That's In re Ratti since 1959. Now, the director... You don't have anything else other than Ratti. I mean, you have the patent manual citing to it and that's it. That's correct. And by the same token, the director has nothing that says In re Ratti was overruled or overturned, merely asserts that Ratti doesn't apply to a case like this where the modification is easily made and its benefits readily apparent. Well, there's no citation of law in the director's brief that says that that's true, that you can override In re Ratti or the MPEP 2143.01 either. And just because it's allegedly easy or an easy modification, the only way it's readily apparent is by hindsight. Mr. Slotsnick's disclosure said we're going to put a left-right asymmetrical design for giving orientation. The reason for modifying, which I'll address that now too, is this W3C reference. And this is really a fairly weak reason to modify. In the director's brief and in the brief below at the Board of Appeals and through the examination, I think it got morphed into being something stronger than it is. But if you refer to the W3C reference, which the W3C is a nonprofit organization of Well, if we look at the actual pages relied upon in the W3C, which are the guidelines at A127 and A128, it merely says, if you read the actual language here, I read it over and over, provide context and orientation information. It doesn't tell me that I'm going to need orientation information to read from left to right. It's pretty broad. Guideline 13, provide clear navigation mechanisms. Provide clear and consistent navigation mechanisms, such as orientation information, navigation bars, a site map. None of those are mentioned in Weller as being the injectable content. The injectable content in Weller is trademarks, logos, functions like print, filter, calculate. If you look at the only specific recommendation, which is one of the checkpoints in a W3C, it says 13.4. Use navigation mechanisms in a consistent manner. Priority 2. Well, if I go back and look at a Priority 2 checkpoint on page A114, it says a Priority 1 is a web content developer must satisfy this checkpoint. Priority 2, on the other hand, says a web content developer should satisfy this checkpoint. Well, you should do this. The director is saying every web page in the world should be changed so it has a tag to put injectable content in. So, it's really destroying the principle, eviscerating the principle of operation of Weller. So, in the Weller, in Fig. 3, it's the only embodiment shown. It goes and looks for tags to put this injectable content. Without having the Weller reference look for the tag, it defeats the purpose of Weller. Well, the director goes on to say... Is it the purpose that counts or the structure that's disclosed? Well, it's the structure that's disclosed and that structure has a reason. And if you take away the structure that satisfies the reason for his invention, I think you're changing the principle of operation of the primary reference. The director addresses that though. In rebuttal in their brief in opposition, he said, okay, well look, if you skip those first three steps on Fig. 3 and always inject content, it's okay because you'll have the additional content that's recognized in the steps below. If you notice in steps S230 through 240, okay, we're going to analyze received content for additional tags. If additional tags are found, we're going to insert that additional content. Well, in the language that supports Fig. 8, the figure that the director is referring to is on the left-hand side. So at the bottom of column 10 and the top of column 11 on pages 8103 to 8104, as shown in Fig. 8, the graphical user interface 900 includes an injectable content bar 910. That's the bar on the left. The injectable content bar 910 includes all of the non-selectable injectable content functions, the selectable injectable content functions, and the custom injectable content functions. So if the director is right and we could take the W3C weak teaching and modify Fig. 8 so that now we're going to always put injectable content, and I'm not sure what injectable content they mean. Which of the plethora of injectable content do we decide to put on every page? Mr. Simmons, you wanted to reserve some time. You can either continue or reserve. I'll reserve the time. Mr. Krauts. May it please the Court? I think the easiest way to understand this rejection in this case is to look at Fig. 6 and Fig. 8 of Weller. We've got them both reproduced opposite page 4 of the red brief. As Mr. Simmons acknowledges, Fig. 8 teaches essentially the display that is claimed in his invention. But the claim says always inserting the left right. Is that what Weller does? Weller does not necessarily do that. I have a little bit of a disagreement with Mr. Simmons as to whether the tag embodiment is a fundamental embodiment in all the claims. It's described at only one place in the specification. It's described in the context of Fig. 3. I think the examiner and the board both assumed for purposes of arguments that tags was a requirement in Weller. But then the examiner looked at this figure and simply said, well, all you have to do is remove the tag function, this conditional function, and you would arrive at Fig. 8 always. And then you'd always have that left right display. The examiner took the position, it's at A69 and A70, that the principle of operation of Weller was not something to do with the tags, but was just this idea of inserting injectable content into a web display. And that's how, for him, it was an easy matter to simply remove the conditional nature of Weller and arrive at Fig. 8 always, especially when you look at W3C, which talks about the advantages of having consistent navigation aids, orientation, and context. That's a pretty weak secondary reference, isn't it, W3C? In fact, it's barely necessary, I would say. I mean, I think, again, if you look at Fig. 8, if you don't read the rest of Weller, you might well say Fig. 8 itself anticipates. And you could also say it's obvious to make that always because there's clearly going to be a benefit to having a consistent layout. You want to know where your print function is. But I do think that when you add W3C to it, it provides us the necessary comfort that somebody, yes, in that field of art would recognize that it is indeed a good idea to put those icons in the same place all the time. Mr. Simmons argues that removing these tags is a rather substantial step that would eliminate an intended purpose of the whole invention. His argument, as I understand it, is that suggests that one of ordinary skill in the art would not want to do that. I think that's his argument. I don't think it's correct. Weller describes many, many different embodiments, one of which is this idea of if you have a PDA, which can't store a lot of, doesn't have a lot of memory, and if you're downloading big documents on your PDA, that'll slow down the operation of that machine. This is 2003. Remember, this is before iPhones and Kindle Fires and all that. But the Weller invention is, well, let's put up a proxy server there. And so if there is some big downloadable file, that's on the proxy server. But if you want to print it or store it from your PDA, then you can do that from your PDA without slowing down the operation of the PDA. And so that's the embodiment where you're looking for links within the webpage, links that you don't necessarily want to download onto your PDA. But it also talks about simply using this idea of injecting content into a webpage, such as a corporate logo, that would be a minuscule amount of space, wouldn't affect the operation of a PDA. You could inject that all the time. And I don't see any reason why you wouldn't want to have the corporate logo on every single page. And if that's not specifically in Weller, it's an obvious modification to Weller, and that could be placed in a left-right orientation like the icons on figure eight as well. Mr. Simmons says that what you're saying is every webpage in the world should be changed. Not at all. Only if you accept this idea that the tag is a fundamental feature of Weller in some way, which we don't. Our idea is we would simply remove the tag. And then what happens is it's the software that intercepts the webpage that inserts this left-right asymmetrical design. And so it's not anything to do with the webpage. If we retain the tags in every single webpage, even then I'm not sure if that's correct, because the assumption is still, you know, you look in the webpage for the tag, but then we still have this extra idea in our rejection that you would be inserting left-right asymmetrical design beyond that. And that would be helpful to a user. I don't have a lot more to add. I'm happy to discuss in Ray Ratti. I think that's a very distinguishable bowl on the facts of this case. I know it's a plurality decision, but it's, again, it had to do with they tried to combine a seal that was used, a bore seal with a coffee maker, and the court said the coffee maker was in a remote art. And also would change the fundamental operation of the original seal, which was stiff in the underlying reference where the coffee maker seal was flexible for very different reasons. So I'm looking for further questions. No one ever gets penalized for not using all their time. Thank you, Your Honor. Thank you, Mr. Krauss. Mr. Simmons has some rebuttals on it. Thank you, Your Honor. I wanted to address one point that I missed in my opening and which the director's solicitor has pointed out. He said that there's an embodiment where it doesn't require a tag to insert a logo. And we strongly disagree with that. In the 899 section, it talks about all the different types of injectable content there are. If you look at column 2 from about lines 20 through 36, it says the invention provides both non-selectable injectable content and selectable injectable content. The selectable injectable content includes displayed icons, symbols, trademarks, or the like, such as a corporate logo. The selectable injectable content could be represented by icons, buttons, selectable items, or the like, which represent an underlying function to be performed. And then they list the underlying functions. Well, without having a tag, how would the system of Weller know what injectable content to put in that spot? There's no screen shown in any of the figures that says always put the corporate logo injectable content anywhere. All the screens are for setting up where you would place the injectable content on the screen, left, right, bottom, top, next to the link. And the other screens talk about which type of injectable content you could have, but it doesn't say, okay, select this one as the default. You can always put this on the left. So we strongly disagree that there's an embodiment that says you can put the corporate logo on the page without a tag. The Weller reference requires that there be a tag. Also, the reference to the modification that the director is making says that the text supporting figure eight, upon which the director relies, states that the injectable content bar includes all of the non-selectable injectable content, the selectable injectable functions, and the custom injectable content functions. So if we were to make the director's change where you would eliminate and you would always inject the corporate logo on the left, because the user selected the left, when it found additional tags, those additional tags would then put injectable content on the left as well. So now that doesn't meet the claim limitation, because the claims call for always inserting a left, right asymmetrical design into the source code. So I'll left, right the asymmetrical design, the asymmetrical design, extending along at least the left, right edges of the coded file. So now if I had a webpage that had no tags, using the director's example, it would insert a corporate logo on the left. If the user downloads another webpage that has additional tags, it's going to add those additional functions to the left. Now the asymmetrical design is not the same between the first page and the second page. So even if the modification were correct, which we disagree with, in view of N. Ray Ratty, even if it were correct, then you wouldn't have a single claimed asymmetrical design always extending on the left, right edge. Are there any further questions I'd like to address? Apparently not. Thank you, Mr. Simmons. We'll take the case under advisement. Thank you, Your Honors.